IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK CHEFFERS in his capacity as Securityholders' Representative,<br><br>             Plaintiff,<br><br>   v.<br><br>IDEAGEN SOFTWARE INC.,<br><br>             Defendant. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 24-866 (MN)<br>)<br>)<br>)<br>)<br>) |

## **MEMORANDUM OPINION**

Raymond J. DiCamillo, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; John J. Tumilty, MORSE, BARNES-BROWN & PENDLETON, P.C., Waltham, MA – Attorneys for Plaintiff

Frederick B. Rosney, Zhao (Ruby) Liu, THE ROSNER LAW GROUP LLC, Wilmington, DE; Michael M. Munoz, GOLENBOCK EISEMAN ASSOR BELL & PESKOE LLP, New York, NY – Attorneys for Defendant

September 4, 2025
Wilmington, Delaware


**NOREIKA, U.S. DISTRICT JUDGE**

Before the Court is Defendant's motion to partially dismiss and stay this action under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. (D.I. 16). For the reasons that follow, the Court will GRANT the motion and STAY the case.

**I.    BACKGROUND**

**A.    The Parties**

This case centers on a contract dispute in the wake of a merger. According to the complaint ("Complaint"), Ives Group, Inc. d/b/a Audit Analytics ("Audit Analytics") was a financial data analytics company that "deliver[ed] data and expert advice that assists with risk assessments and market intelligence" to public regulators, private accounting firms, and other financial markets participants. (D.I. 2 ¶¶ 8-11). Audit Analytics was founded by Mark Cheffers, a Tennessee citizen and the Plaintiff here ("Plaintiff" or "Cheffers").[1] (*Id.* ¶¶ 3, 13, 43, 54).

In 2021, Audit Analytics sought to be acquired. (*Id.* ¶¶ 12-13). After a $50 million deal in principle fell through with a third-party buyer, Audit Analytics was approached by Defendant Ideagen Software Inc. ("Defendant" or "Ideagen") in August 2021 about an acquisition. (*Id.*). Ideagen is a Delaware-incorporated software company with a principal place of business in Nottinghamshire, United Kingdom. (*Id.* ¶ 4).

On October 26, 2021, the two sides executed a $50 million triangular merger agreement ("the Merger Agreement"), with the result that Audit Analytics would become a wholly-owned subsidiary of Ideagen ("the Company"). (*Id.* ¶ 17; D.I. 2-1 at 1). Cheffers served as the "principal

---

[1]    According to the Complaint, Cheffers is the "Securityholders' Representative" under the merger agreement at issue in this action and the successor to the original representative, Shareholder Representative Services LLC. (D.I. 2 ¶ 3).

deal negotiator" on behalf of Audit Analytics. (D.I. 2 ¶ 43). Several days later, on November 2, 2021, the merger closed ("the Merger"). (*Id.* ¶¶ 17, 32).

### B. The Merger Agreement

The Merger Agreement contains three provisions key to the current dispute: (1) an "earnout" clause ("the Earnout") (D.I. 2-1 § 1.13(a)); (2) an "ordinary course" clause ("the Ordinary Course Clause") (*id.* § 1.13(e)); and (3) a provision stipulating to submit any dispute regarding the Earnout to "the Accounting Firm" for resolution ("the Accounting Firm Provision") (*id.* § 1.13(h)).

#### 1. The Earnout

The crux of this case is that Ideagen's $50 million Merger payment was broken down into two parts: (i) an upfront $45 million purchase price paid to Audit Analytics at closing, and (ii) a $5 million back-end bonus ("the Earnout Payment"), contingent upon the combined Company's post-close achievement of a certain performance benchmark. (D.I. 2 ¶¶ 13, 16, 20-22). If that target were reached, Cheffers would be eligible for a share of the Earnout Payment, along with certain other of Audit Analytics' stockholders and managers ("the Earnout Candidates"). (*Id.*).

An earnout is one kind of provisional consideration, common to mergers and acquisitions, that gets its name from the condition that the payment candidates must "earn out" the bonus through continued post-sale performance. *See, e.g.*, *MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316, 321-22 (D. Del. 2019), *aff'd*, 2021 WL 3503805 (3d Cir. Aug. 10, 2021); *Philip A. Templeton, M.D., P.A. v. EmCare, Inc.*, 868 F. Supp. 2d 333, 337 (D. Del. 2012). As the Second Circuit has explained, an "earnout permits parties to conclude a merger without first agreeing as to the proper valuation of the target company." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 810 n.1 (2d Cir. 2014). Instead, "[t]hrough a contingent

payment structure, the parties agree to disagree and defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved." *Id.*

Here, the Merger Agreement stipulated that the $5 million Earnout Payment would be paid to the Earnout Candidates "in the event that the [Company's] ARR is at least $13,000,000 (the 'EP Threshold') for the First EP Measurement Period, or . . . for the Second EP Measurement Period." (D.I 2-1 § 1.13(a); D.I. 2 ¶ 21). "ARR" is a bespoke earnings metric calculated pursuant to a complex mathematical formula precisely defined in the "Definitions" appendix of the Merger Agreement. (D.I. 2-1, Ex. A at 1; D.I. 2 ¶ 22). For the purposes of the present motion, it suffices to conceive of ARR as revenue or sales.

Although the proper Earnout window is disputed by the parties,[2] the Merger Agreement defines the First and Second EP Measurement Periods as "beginning on November 1, 2021 and ending on October 31, 2022," and "beginning on November 1, 2022 and ending on October 31, 2023," respectively. (D.I. 2-1, Ex. A at 7, 12.). Thus, Cheffers and his group would be entitled to the $5 million Earnout Payment if the post-Merger Company recorded $13 million or more in ARR during either one of the year-long EP Periods. That performance would be memorialized in a statement compiled by Ideagen and delivered to the Earnout Candidates shortly after the close of each EP Period ("the Earnout Statement"). (*Id.* § 1.13(f)).

### 2. **The Ordinary Course Clause**

The second relevant provision here is the Ordinary Course Clause. (*Id*. § 1.13(e)). That provision warranted that Ideagen "will operate the Company in the ordinary course of business

---

[2] Cheffers contends that "the parties agreed to two consecutive 12-month EP Measurement Periods running from the Closing." (D.I. 23 at 2). As a result, he reasons, because "the Closing occurred on November 2, 2021, two days after the date in the Merger Agreement [October 31, 2021], the two EP Measurement Periods should have been run from November 3, 2021 through November 2, 2022 and from November 3, 2022 through November 2, 2023." (*Id.*; D.I. 2 ¶¶ 31-35).

and shall act in good faith and use commercially reasonable efforts to facilitate the Company's ability to reach the EP Threshold." (*Id.*). This was important to safeguard the Earnout, because Cheffers' opportunity to receive the $5 million bonus would be meaningless if Ideagen "purposefully undermined the business to avoid payment of the Earnout Consideration." *Barnard v. Marchex, Inc.*, No. 22-1382 (CFC) (SRF), 2024 WL 406441, at *6 (D. Del. Feb. 2, 2024), *report and recommendation adopted in relevant part*, 2024 WL 3439808 (D. Del. July 17, 2024). So Ideagen promised that it would "not take or omit to take any action with the express purpose and intent of, absent a good faith business rationale for its actions, preventing the achievement of the Earnout Payment." (D.I. 2-1 § 1.13(e)); *see also Rheault v. Halma Holdings Inc.*, No. 23-700 (WCB), 2023 WL 8005318, at *2 (D. Del. Nov. 7, 2023) (involving similar good faith earnout provision).

### 3. The Accounting Firm Provision

Lastly, Section 1.13(h) of the Merger Agreement, the Accounting Firm Provision, sets out a dispute resolution protocol for precisely this type of disagreement, deemed an "Earnout Disputed Matter." (D.I. 2-1 § 1.13(h)). The Provision stipulates that "any such unresolved Earnout Disputed Matters shall be submitted for determination to the Accounting Firm" (*id.*), which shall be "a mutually acceptable nationally-recognized (non-'Big Four') independent accounting firm." (*Id.* § 1.10(f)). Upon selection by the parties and review of the dispute, "[t]he Accounting Firm will make its determination based on the written submissions of the Parties and the terms and conditions of [the Merger] Agreement" ("the Accounting Firm Determination"). (*Id.* § 1.13(h)). The parties agreed that "[t]he determination of the Accounting Firm will be final and binding," and, once rendered, must be incorporated into the "Final Earnout Statement." (*Id.*) ("The Parties shall revise the Earnout Statement to reflect the final resolution or final determination of the

4

Accounting Firm . . . and such revised Earnout Statement will become the 'Final Earnout Statement' with respect to the Earnout Payment.").

Like the Ordinary Course Clause, the Accounting Firm Provision is a typical feature of earnout agreements, because properly calculating an earnout requires deep knowledge of accounting. *See, e.g.*, *Bus Air, LLC v. Woods*, No. 19-1435 (RGA), 2022 WL 2666001, at *3 (D. Del. July 11, 2022); *MarkDutchCo*, 411 F. Supp. 3d at 323; *Barnard*, 2024 WL 406441, at *3. For this reason, "accounting firms are commonly relied on as experts to resolve questions about post-merger financial[s]."[3] *Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 211 (3d Cir. 2023).

### C.   The Current Dispute:  Denial of the Earnout

An earnout can be a tricky mechanism.  It functions partially as a valuation tool by giving the seller post-purchase proof that it got what it paid for.  *See, e.g.*, *Bus Air*, 2022 WL 2666001, at *3.  Earnouts can also be intended to align the interests of buyers and sellers by mutually incentivizing go-forward performance, particularly when the acquired company's management stays on following the merger.  *See, e.g.*, *Kelly v. DCC Tech. Holdings, Inc.*, 724 F. Supp. 3d 122, 133 (W.D.N.Y. 2024).  In that scenario, the more the buyer makes after the combination, the more the seller deserves as a bonus for successful integration.  Or so the theory goes.  *See, e.g.*, *Templeton*, 868 F. Supp. 2d at 337; *Sec. Plans*, 769 F.3d at 810.

In reality, earnouts often include unintended consequences, particularly as sales approach the earnout threshold.  For instance, earnout candidates may be encouraged to artificially stimulate revenues for the near-term purpose of hitting their target, even when it hurts the company in the long run.  Such tactics might include heavy discounting, pulling sales forward, or even, sometimes,

---

[3]   Section 1.10 of the Merger Agreement contains a similar Accounting Firm dispute resolution mechanism for any disputes between the parties concerning the Closing Statement. (D.I. 2-1 § 1.10).  *See* n.4, *infra*.

nefarious means like accounting chicanery. *See, e.g.*, *Vista Outdoor Inc. v. Reeves Fam. Tr.*, 234 F. Supp. 3d 558, 568 (S.D.N.Y. 2017) (sellers in earnout dispute improperly recognized revenue in attempt to meet sales threshold), *aff'd*, 725 F. App'x 17 (2d Cir. 2018). On the other hand, the buyer – now in control of the post-merger company – may be loath to part ways with the bonus originally promised to the seller. That view might lead him to frustrate the company's capture of the earnout either on the front end – such as by curtailing sales – or on the back end – through accounting adjustments. According to the Complaint, that is just what happened here.

The parties do not appear to dispute that the $13 million target for the First EP Period was not met. The Company posted shy of $12 million for that period. (D.I. 2, Ex. 2 at 1). During the second year, however, Cheffers alleges that the Company surpassed the Earnout threshold by the November 2023 deadline. (*Id.* ¶¶ 23, 58-61, 81). According to Cheffers, ARR for that Period was $13,147,978.98, approximately $147 thousand above the target. (*Id.*). That number was generated by Ideagen's digital sales ledger and reviewed by the Company's financial personnel. (*Id.*). As further evidence of the feat, the Complaint says, Ideagen's SVP of Group Finance congratulated one of the other Earnout Candidates on hitting the Earnout. (*Id.* ¶¶ 24, 58, 73).

Nevertheless, on December 15, 2023, Ideagen issued an Earnout Statement for the Second EP Measurement Period stating that the Company had reached only $12,980,712.98 in ARR – $19,287.02 short of the $13 million mark ("the Initial Earnout Statement"). (*Id.* ¶¶ 24, 64 & Ex. 3 at 1). In response, on January 10, 2024, the Earnout Candidates submitted a formal objection pursuant to Section 1.13(h) of the Merger Agreement. (*Id.* ¶¶ 26, 78 & Ex. 4). Their Earnout Objection Notice argued that Ideagen's Initial Statement erroneously omitted $167,137 in ARR across 14 sales accounts, and, therefore, that the correct Earnout calculation was the $13,147,849.98 originally recognized in November 2023. (*Id.*, Ex. 4 at 1-2).

6

On March 8, 2024, Ideagen issued a revised Earnout Statement ("the Revised Earnout Statement"). (*Id.* ¶ 85 & Ex. 5). The Revised Earnout Statement determined that the proper calculation was $12,776,715.53, a further markdown from the Earnout Candidates' figure. (*Id.* ¶ 86 & Ex. 5 at 2). The Revised Earnout Statement provided two bases for the adjustment: (i) an $85,827.20 deduction because eight of the accounts were recorded after the October, 31, 2023 close of the Second EP Period and were, therefore, ineligible; and (ii) that Ideagen identified $282,907.25 of ARR "that was in fact not paid by the identified customers and overdue by 90 days at the time of preparation of the Initial Earnout Statement, and as such should be excluded from the calculation of ARR." (*Id.* ¶¶ 86-88 & Ex. 5 at 2). Ideagen clarified that "[t]he exclusion of these unpaid amounts from ARR is in line with [Ideagen's] historical acquisition receivables accounting policy" ("the 90 Day Policy"). (*Id.*, Ex. 5 at 2).

On April 3, 2024, the Earnout Candidates objected to the Revised Earnout Statement in a Second Earnout Objection Notice. (*Id.* ¶¶ 91 & Ex. 6). The Second Notice argues, among other things, that the 90 Day Policy violates the Merger Agreement, is inconsistent with the Earnout Candidates' post-close responsibilities, and is improperly applied from an accounting perspective. (*Id.*, Ex. 6 at 4-5). Or, as the Complaint puts it, "Ideagen has made up the Alleged 90 Day Policy from whole cloth for the purpose of preventing payment of the Earnout Payment." (*Id.* ¶¶ 104-05 ) ("[The 90 Day Policy] is a bald-faced effort to avoid making the Earnout Payment").

Since the close of the Objection correspondence, Ideagen has refused to pay out the Earnout Payment. (*Id.* ¶ 108). The dispute was never submitted to the Accounting Firm. (*See* D.I. 17). Cheffers now challenges Ideagen's denial in this Court.

D.  **PROCEDURAL HISTORY**

On July 25, 2024, Cheffers initiated this action against Ideagen, asserting nine counts for fraud, negligent misrepresentation, breach of contract, breach of the implied covenant of good faith

7

and fair dealing, and declaratory judgment. (D.I. 2). On September 13, 2024, Ideagen moved to dismiss for failure to state a claim as well as to stay the action and compel arbitration under the Accounting Firm Provision. (D.I. 16, 17). Cheffers filed his answering brief on October 14, and Ideagen replied on October 21. (D.I. 23, 25). The Court now addresses the motion.

## II. LEGAL STANDARD

### A. Motion to Dismiss Under Rule 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022); *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). Nonetheless, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Lutz*, 49 F.4th at 327. The Court does not accept "bald assertions," "unsupported conclusions and unwarranted inferences," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016), or allegations "so threadbare or speculative that they fail to cross the line between the conclusory and the factual." *Connelly*, 809 F.3d at 790 (citation omitted). Instead, the pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### B. The Rule 9(b) Pleading Standard for Fraud

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This is a "heightened pleading standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007); *Frederico v. Home Depot*, 507 F.3d 188, 200

8

(3d Cir. 2007) (Rule 9(b) has "stringent pleading restrictions"). "[T]o comply with Rule 9(b), [a complaint] must allege 'the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation' and must state 'the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'" *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (quoting *Frederico*, 507 F.3d at 200).

The Complaint alleges that Cheffers and the Earnout Candidates were deprived of $5 million as a result of "Ideagen's fraudulent and bad faith acts." (D.I. 2 ¶¶ 114, 119, 126, 135). "[B]ecause [these] claims sound in fraud," they "must be stated with particularity" under the heightened standard of Rule 9(b). *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996); *Carson v. HP Inc.*, No. 22-208 (CJB), 2024 WL 4300653, at *8 (D. Del. Sept. 26, 2024).

### C. Motion to Stay

"A decision to stay litigation lies within the sound discretion of the court and represents an exercise of the court's inherent power to conserve judicial resources by controlling its own docket." *Peschke Map Techs., LLC v. J.J. Gumberg Co.*, 40 F. Supp. 3d 393, 395-96 (D. Del. 2014) (internal quotation marks omitted). "Typically, courts consider three factors in deciding how to exercise this discretion: (1) whether a stay will simplify the issues for trial; (2) the status of the litigation, particularly whether discovery is complete and a trial date has been set; and (3) whether a stay would cause the non-movant to suffer undue prejudice from any delay or allow the movant to gain a clear tactical advantage." *454 Life Scis. Corp. v. Ion Torrent Sys., Inc.*, No. 15-595 (LPS), 2016 WL 6594083, at *2 (D. Del. Nov. 7, 2016); *Advanced Microscopy Inc. v. Carl Zeiss Microscopy, LLC*, No. 15-516 (LPS), 2016 WL 558615, at *1 (D. Del. Feb. 11, 2016). "A stay is particularly justified when the outcome of a [separate] proceeding is likely to assist the court." *Brit. Telecomms. PLC v. IAC/InterActiveCorp*, No. 18-366 (WCB),

9

2020 WL 5517283, at *2 (D. Del. Sept. 11, 2020) (internal quotation marks omitted); *TC Tech. LLC v. Sprint Corp.*, No. 16-153 (WCB), 2021 WL 4521045, at *7 (D. Del. Oct. 4, 2021).

### III. DISCUSSION

#### A. Motion to Dismiss

##### 1. The Accounting Firm Determination

At the outset, the parties dispute whether this case should go to arbitration. Ideagen contends that the Accounting Firm Provision is an arbitration clause that requires the parties to submit this entire dispute to the Accounting Firm rather than this Court. (D.I. 17 at 11-13). Cheffers counters that the Provision is an "expert determination" that is limited to resolving the Earnout calculation, and, therefore, that the case may proceed here. (D.I. 23 at 10-11).

In this same context, the Third Circuit recently set out a four factor test for whether an alternative dispute resolution clause constitutes an arbitration agreement or an expert determination. *See Sapp*, 75 F.4th at 213-14. Those factors include: (1) the "scope of authority granted to the Accounting Firm" by the challenged provision; (2) the time provided in the provision "for the Accounting Firm to make its decision"; (3) whether "the provision includes [any] procedural rules that would govern the alleged arbitration"; and (4) whether the relevant contract elsewhere includes a litigation or mediation section. *Id.*; *Barnard*, 2024 WL 406441, at *4. Analyzing these criteria leads to the conclusion that the Accounting Firm Provision calls for an expert determination, not arbitration.

First, contrary to Ideagen's contention, the Provision is "narrow" in scope. *Sapp*, 75 F.4th at 213. The Accounting Firm Determination pertains only to "objections or proposed changes to an Earnout Statement," which is the "statement setting forth [Ideagen's] calculation of the ARR for [the Earnout] period, along with information demonstrating the calculation thereof." (D.I. 2-1 §§ 1.13(f) & (h)). In essence, the Accounting Firm is limited to evaluating one thing: whether

the Earnout Statement issued by Ideagen properly tabulated ARR under the Merger Agreement's protocol and applicable accounting standards. *See Barnard*, 2024 WL 406441, at *4 ("[T]he [Agreement] narrows the dispute procedure to only those items still in dispute with respect to the Earnout Statement.") (internal quotation marks omitted). This implicates whether to recognize certain revenue or exclude certain collectibles – "all factual disputes within the normal expertise of an accountant, and that technical expertise weighs in favor of expert determination." *Sapp*, 75 F.4th at 213 ("[E]xpert-determination provisions typically limit the decision maker's authority to deciding a specific factual dispute within the decision maker's expertise.") (internal quotation marks omitted); *Bus Air*, 2022 WL 2666001, at *3 ("In a typical expert determination, the authority granted to the expert is limited to deciding a specific factual dispute concerning a matter within the special expertise of the decision maker, usually concerning an issue of valuation.") (internal quotation marks omitted). This makes particular sense given that it would be unusual for contractual counterparties to submit legal disputes, such as the fraud and breach of contract claims at issue here, to an accounting firm rather than a lawyer. *See Bus Air*, 2022 WL 2666001, at *3 ("[T]he [Agreement] requires the [Accounting Firm] to resolve factual disagreements calling for expert determination regarding a calculation, as opposed to disagreements calling for resolution by legal professionals.").

Second, the Provision does not set out a deadline for the Accounting Firm Determination. It does not, for instance, "provide[] only thirty days for the Accounting Firm to make its decision." *Id.* That weighs in Ideagen's favor. *Cf. Barnard*, 2024 WL 406441, at *4.

Third, the Provision "contains no reference to a standard set of rules, like those of the American Arbitration Association or any procedures beyond those mentioned for how the [chosen] Accounting Firm should make its decision." *Barnard*, 2024 WL 406441, at *4 (internal quotation

11

marks omitted); *Sapp*, 75 F.4th at 214. "[T]he lack of reference to procedural rules suggests that the agreement was simply allowing for an expert determination, not for arbitration," *Bus Air*, 2022 WL 2666001, at *3, because "[p]arties typically show an intention to arbitrate when their contract contains arbitration-like procedures." *Sapp*, 75 F.4th at 214. As there are none here, it is reasonable to infer that the parties meant only for the Accounting Firm to adjudicate Earnout disputes. *See Bus Air*, 2022 WL 2666001, at *3 ("Under Delaware law, this lack of arbitration language weighs against a finding of a clear intent to arbitrate.").

Fourth, and finally, Section 10.5 of the Merger Agreement provides that "each of the parties irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the federal court of the State of Delaware."[4] (D.I. 2-1 § 10.5) (capitalization omitted). This forum selection clause would have no meaning if the Court were to accept Ideagen's suggestion that the Accounting Firm Provision mandates arbitration. Thus, "[t]hese terms further support the conclusion that the parties agreed to only an accounting-based arbitration provision." *Kelly*, 724 F. Supp. 3d at 157.

"Overall, many features of the [Merger] Agreement indicate the parties intended the Accounting Firm to be an expert, not an arbitrator." *Sapp*, 75 F.4th at 215; *FNB Corp. v. Mariner Royal Holdings, LLC*, No. 19-1643 (LPS) (JLH), 2020 WL 1475021, at *4 (D. Del. Mar. 26, 2020)

---

[4]  Notably, Section 10.5 includes a carve out for disputes "as set forth in Section 1.10." Section 1.10 addresses "Closing Statement Disputed Matter[s]" to be submitted to the Accounting Firm. It is a sister provision to the Accounting Firm Provision squarely at issue here under Section 1.13. Nonetheless, "[u]nder Delaware law, courts must give each provision and term effect so as not to render any part of the contract mere surplusage." *Sapp*, 75 F.4th at 214 (internal quotation marks omitted). Because Section 1.10 and 1.13 both involves financial statement disputes to be resolved by the Accounting Firm, and the Accounting Firm Provision in Section 1.13(f) would otherwise be reduced to surplusage, the Court reads the omission of Section 1.13 from the Section 10.5 carve out "as a scrivener's oversight" and applies the exemption equally to Section 1.13. *Id.* at 215.

("[T]he contract language demonstrated the parties' intent to engage in an expert determination"), *report and recommendation adopted*, 2020 WL 13880678 (D. Del. May 11, 2020). Accordingly, "the language in the [Agreement] for referral of disputes to [the] Accounting Firm is not an arbitration agreement but instead is an expert determination provision." *Barnard*, 2024 WL 406441, at *7. Ideagen's motion to compel arbitration on that basis is therefore denied.

### 2. The Fraud Claims

Ideagen also moves to dismiss Counts I, II, and III of the Complaint for fraud and negligent misrepresentation. As to Counts I and III, Ideagen asserts that the alleged misstatements merely duplicate the contractual obligations already contained in the representations and warranties section of the Merger Agreement – known as "bootstrapping." (D.I. 17 at 17). Ideagen also contends that Count II fails to allege reliance. (*Id*. at 18). The Court agrees as to each.

#### a. Bootstrapping

"[T]he 'bootstrapping doctrine' under Delaware law bars a common law fraud claim that is duplicative of a related breach of contract claim." *Rheault*, 2023 WL 8005318, at *3. Therefore, "a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort." *OC Tint Shop, Inc. v. CPFilms, Inc.*, No. 17-1677 (RGA), 2018 WL 4658211, at *5 (D. Del. Sept. 27, 2018) (internal quotation marks omitted). The exception is that, "if the alleged contractual breach is accompanied by the breach of an independent duty imposed by law, the same factual assertions may support both a breach of contract and tort claim." *Id.*

Here, Counts I and III identify two alleged misrepresentations by Ideagen: that it "(i) would operate the [Company] in the ordinary course of business and (ii) act in good faith and use commercially reasonable efforts to facilitate the [Company's] ability to reach the EP Threshold." (D.I. 2 ¶¶ 110-11, 128-29). The Complaint also asserts an omission theory, that Ideagen

13

negligently or "intentional[ly] misrepresent[ed] that the formula for calculating the ARR of the [Company], as set forth in the definition of ARR in the Merger Agreement, would be the formula actually used to calculate the ARR," by making negligent or "intentional omissions regarding both (i) the existence of its Alleged 90 Day Policy and (ii) that Ideagen intended to apply that alleged policy when calculating the ARR of the [Company] for each of the First EP Measurement Period and the Second EP Measurement Period." (*Id.* ¶¶ 113-15).

Each of these alleged misrepresentations or omissions directly tracks the language of the Merger Agreement itself. First, as already discussed, the Ordinary Course Clause explicitly states that Ideagen "will operate the Company in the ordinary course of business and shall act in good faith and use commercially reasonable efforts to facilitate the Company's ability to reach the EP Threshold." (D.I. 2-1 § 1.13(e)). That corresponds with Cheffers' first alleged misstatement about operating in the "ordinary course."

The Ordinary Course Clause goes on to bind Ideagen to the obligation that it "will not take or omit to take any action with the express purpose and intent of, absent a good faith business rationale for its actions, preventing the achievement of the Earnout Payment." (*Id.*). That addresses the second purported misstatement about "good faith" efforts.

Indeed, Cheffers himself concedes that "Ideagen made these misrepresentations during the negotiation of the Merger Agreement as described above ***and also in Section 1.13(e) of the Merger Agreement***" and "***in the definition of ARR in the Merger Agreement***." (D.I. 2 ¶¶ 110, 112, 128, 130) (emphasis added). Such an admission is terminal. *See Perrigo Co. v. Int'l Vitamin Co.*, No. 17-1778 (MWB), 2019 WL 359991, at *2 (D. Del. Jan. 29, 2019) ("[A] tort claim cannot be based solely on a violation of a contractual duty.").

14

As for the alleged omissions, they turn on the claim that Ideagen never "intended" to abide by the ARR formula set out in the Merger Agreement. (D.I. 2 ¶¶ 113-15, 132-34; D.I. 2-1, Ex. A at 1). But a fraud claim can survive a motion to dismiss only "when the allegations of fraud do not rely solely on the intent not to perform obligations imposed by an agreement." *Rheault*, 2023 WL 8005318, at *5. Here, "[a]lthough [Plaintiff] attempts to frame the [alleged] misrepresentations as an inducement to close on the agreement, [Defendant] made the representations in performing under the Agreement" – that is, in explaining how Ideagen calculated ARR in the Initial and Revised Earnout Statements. *CLEAResult Consulting, Inc. v. EnerNOC, Inc.*, No. 17-837 (MAK), 2017 WL 4638592, at *6 (D. Del. Oct. 16, 2017).

Thus, Plaintiff's "fraud claim[s] [are] based entirely on a breach of the Agreement, not a violation of an independent duty imposed by law, and [are] improperly bootstrapped to [the] breach of contract claim[s]." *Id.*; *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 529 (D. Del. 2012) ("[T]he only fraud alleged in the amended complaint is fraud in the performance of the contract."). The Court will dismiss Counts I and III.

### b. Reliance

Count II of the Complaint asserts a claim for common law fraud on the basis that the Initial Earnout Statement issued by Ideagen was "knowingly misleading" because it misstated the ARR at $12.98 million – below the $13 million bonus threshold. (D.I. 2 ¶¶ 121-126). According to the Complaint, the Statement was false because it artificially deflated ARR by excluding, among other things, certain contracts and subscriptions that would have brought the total well over the target. (*Id.*). To the extent those allegations reiterate that Ideagen knowingly miscalculated ARR under the Merger Agreement, they fail as improper bootstrapping for the reasons just discussed. They also fail to allege the essential element of reliance.

15

To state a fraud claim under Delaware law, a plaintiff must not only allege that the defendant lied to him; he must also allege that he "reasonably relied upon the false statement, to his detriment." *Johnson v. GEICO Cas. Co.*, 516 F. Supp. 2d 351, 358-59 (D. Del. 2007); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 560 (D. Del. 2010). What the Complaint is missing here is such an allegation – that Cheffers and the Earnout Candidates did anything based on Ideagen's alleged misrepresentation in the Initial Earnout Statement. Quite the opposite, the Earnout Candidates immediately challenged the Statement as incorrect. Cheffers does not dispute this in his answering brief. *See In re Wilmington Trust Secs. Litig.*, No. 10-990 (SLR), 2017 WL 2467059, at *2 (D. Del. June 7, 2017) ("When a responding party fails to defend against an issue which is the subject of a motion, courts consistently construe the failure to respond as an abandonment of the issue or a concession that the moving party is correct.").

Accordingly, the Court finds that Count II fails to allege reliance, and the Court will dismiss it as a result.

    **B.**    <u>**Motion to Stay**</u>

Having dismissed the Complaint's fraud claims, the Court finds that the remaining counts – all of which are contract claims – should be stayed pending the outcome of the Accounting Firm Determination.

First, a stay here will simplify the issues. Once the Accounting Firm renders its expert determination on the Earnout dispute, that will answer the key question in this litigation: what is the true ARR for the Second EP Measurement Period? *See Brit. Telecomms.*, 2020 WL 5517283, at *2; *TC Tech.*, 2021 WL 4521045, at *7. Second, this case is in its earliest phase, which weighs in favor of a stay. *See IOENGINE, LLC v. PayPal Holdings, Inc.*, No. 18-452 (WCB), 2019 WL 3943058, at *5 (D. Del. Aug. 21, 2019). Discovery has not commenced, no depositions have been taken, and there is no date for trial. *See 454 Life Scis. Corp.*, 2016 WL 6594083, at *2.

Third, a stay will not prejudice Cheffers, because the dispute will continue to move towards resolution under the review of the Accounting Firm. *Id.* And, moreover, Cheffers and the Earnout Candidates agreed to that expert determination mechanism when they executed the Merger Agreement. (*See* D.I. 2-1 § 1.13(h)).

Accordingly, the Court will grant Ideagen's motion to stay this action so that the parties can seek an expert determination from the Accounting Firm pursuant to Section 1.13(h) of the Merger Agreement.

## IV. **CONCLUSION**

The Court will GRANT Defendant's motion to dismiss Counts I, II, and III of the Complaint, GRANT Defendant's motion to stay the action pending the rendering of the Accounting Firm Determination, and STAY the action. (D.I. 16). An appropriate order will follow.

17